UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
MARK KNOX,

        Plaintiff,

   v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.
---------------------------------------------------------X
GARAUFIS, United States District Judge.

**NOT FOR PUBLICATION**

MEMORANDUM & ORDER
05-CV-1895

Mark Knox ("Knox" or "Plaintiff") brings this action pursuant to section 405(g) of the

Social Security Act, 42 U.S.C. § 405(g).  The Plaintiff challenges Commissioner of Social

Security Jo Anne B. Barnhart's ("Commissioner") final determination denying his application for

Social Security disability benefits from August 5, 1998 through April 28, 2000.  Specifically, the

Plaintiff contends that Administrative Law Judge Eileen P. Burlison ("ALJ Burlison") failed to

properly evaluate his claim of disability during the relevant period.  Now before the court are the

parties' cross-motions for judgment on the pleadings.  For the reasons set forth below, the

Commissioner's motion is DENIED and the plaintiff's motion is GRANTED to the extent that

the case is remanded to the Social Security Administration ("SSA") for further proceedings

consistent with this opinion.

## I.  Background

### A.     *Procedural History*

The Plaintiff filed an application for Supplemental Security Income ("SSI") and for

Social Security Disability ("SSD") on December 4, 1998, alleging that a "disabling condition" had prevented him from working since August 5, 1998. (Transcript of the Record ("Tr.") at 65-67, 348-50). The SSA denied the application initially on March 18, 1999. (Id. at 33-37). The Commissioner determined that the Plaintiff was not disabled and thus not entitled to benefits, noting that the Plaintiff's condition was not "severe enough" to prevent him from performing "medium work." (Id. at 36). The Plaintiff filed a request for reconsideration on March 22, 1999. (Id. at 38-40). The SSA upheld its initial ruling on May 12, 1999, based on the same reasoning as the initial denial. (Id. at 41-44). The Plaintiff then timely requested a hearing on May 14, 1999. (Id. at 45).

The Plaintiff appeared before ALJ Burlison at a hearing on March 9, 2000. (Id. at 355-88). The ALJ determined that the Plaintiff was not eligible for disability benefits in a decision dated April 28, 2000. (Id. at 49-58).

The Plaintiff then requested review by the Appeals Council on May 8, 2000. (Id. at 59). The Appeals Council remanded the case back to the ALJ for further consideration on July 26, 2002. (Id. at 61-63). A second hearing before ALJ Burlison was held on July 10, 2003. (Id. at 389-429). The ALJ affirmed the denial of benefits on December 22, 2003. (Id. at 16-26). The Appeals Council denied the Plaintiff's second request for review on March 18, 2005.

On June 30, 2000, Knox filed another application for disability benefits from April 29, 2000 (the day after the ALJ's first decision) onward. (Id. at 61). That application was approved. (Id. at 61, 392-93).

This action to challenge the Commissioner's final decision regarding the Plaintiff's condition between August 5, 1998 and April 28, 2000 ensued, and was timely filed in accordance

with 42 U.S.C. § 405(g).

**B.     The Plaintiff's Personal and Employment History**

The Plaintiff was born on November 28, 1961, and was 38 years old at the time of the first hearing before the ALJ.  (Id. at 359).  Knox testified that he attended one year of college.  (Id. at 360).  Around 1985 or 1986, the Plaintiff worked as a machine operator at an injection molding plastic company for a year and a half, and Knox then became a maintenance custodian at a public school in Brooklyn, a position he held until August 1998.  (Id. at 360-61, 395-96).  The Plaintiff testified that the custodial job required him sand and strip floors, use buffer machines, repair shades and light fixtures, clean classrooms, paint, mop, sweep, and perform other acts of general maintenance.  (Id. at 360, 394).

**C.     The Plaintiff's Medical History**

As Plaintiff was found to be disabled effective April 29, 2000, the following medical record refers only to evidence relating to Knox's condition during the relevant period of August 5, 1998 through April 28, 2000.

*1.     Relevant Medical Evidence Before April 28, 2000*

Plaintiff stopped working in August 1998 as he began experiencing an array of medical complications.  Plaintiff first visited the emergency room at the Brooklyn Hospital Center on August 5, 1998, complaining of pain in his arm.  (Id. at 158).  He was later diagnosed with gastrointestinal bleeding on August 29, 1998.  (Id. at 157).  A September 10, 1998 examination revealed that Plaintiff suffered from headaches, rectal bleeding and anemia.  (Id. at 154).

On September 15, 1998, the Plaintiff was admitted to Brooklyn Hospital after experiencing two epileptic seizures at home.  (Id. at 124).  He was not discharged until September 25, 1998, and had to be intubated for the first five days.  (Id. at 118).  When he first tried to walk, he fell to the floor.  (Id.).  Internist Dr. Kevin Naing-Thu Lin diagnosed Knox with new a onset of seizures, possibly secondary to hypertension and diabetes mellitus.  (Id. at 118).  Plaintiff displayed a markedly elevated blood sugar level, and his inability to open his eyes or respond to command or pain indicated diabetic coma.  (Id. at 130).  A computed tomography ("CT") scan by Drs. Stacey Funt and Kimberly Bloomfield showed a right occipital lesion, deviation of the posterior aspect of the falx (a section of protective dura mater separating the brain hemispheres) toward the right, asymmetry of the lateral ventricle, regions of low attenuation posterior to the occipital lobe, and a slightly increased thickness of soft tissues adjacent to the back part of the skull, suggesting a small collection of blood under the dura mater.  (Id. at 142-143).  Dr. Lin prescribed Dilantin for the seizure disorder and Dilacor for high blood pressure and chest pain, among numerous other drugs.  (Id. at 119).

On November 21, 1998, Plaintiff was examined by neurologist Dr. James Edmondson.  Dr. Edmondson noted that Knox had no further seizures since September, but suffered from weekly headaches and a lack of balance.  Dr. Edmondson opined that Plaintiff could return to work that week, but that he should not climb or operate dangerous equipment, and that he should not drive for one year.  (Id. at 152).

On December 2, 1998, Dr. Lin examined the Plaintiff, who complained of pain and stiffness in his left shoulder but did not indicate trauma.  Blood pressure was 140/90 (a borderline high reading).  (Id. at 150).  On December 30, 1998, Plaintiff was examined by Dr. R.

Chase, an orthopedic specialist. Knox complained of non-traumatic right shoulder pain and decreased range of motion, leading to an impression of nerve impingement. Dr. Chase recommended applying heat to the shoulder, exercise, and Daypro. (Id. at 150). On January 9, 1999, Plaintiff complained of right shoulder pain to Dr. Lin, though he had not experienced new seizures. (Id. at 151).

On January 12, 1999, Drs. Chase and Edmondson again examined Plaintiff. (Id. at 148-149). Dr. Chase reported persistent right shoulder pain and numbness, but he ruled out nerve impingement and radiculopathy. Dr. Chase recommended an MRI and an electromyography ("EMG"). (Id. at 149). Dr. Edmondson assessed that Plaintiff could not return to work because of his disabling restrictions. (Id. at 148). Even though Plaintiff had not suffered any recent seizures, he reported pain in his arms and hands that was greater on the right side, numbness, and tingling since September 1998. (Id.). A clinical exam revealed a positive Tinel's sign (indicating carpal tunnel syndrome ("CTS")) on the right side, bilateral weak APB (thumb) muscles, and a decrease in distribution of the lateral right median nerve. (Id.). No motor loss in the arms was detected. (Id.). Dr. Edmonson's impression was bilateral CTS and seizure disorder, and he recommended Dilantin and that bilateral wrist splints to be worn at night for one year. (Id.).

On January 23, 1999, Dr. Edmondson completed a medical form for the Division of Disability Determination, repeating his earlier assessment but adding that Plaintiff had normal cranial nerves, deep tendon reflexes, and motor strength, as well as satisfactory gait and manipulation of the hands and fingers. (Id. at 173A-174). Dr. Edmondson opined that Plaintiff required no limitations for lifting, carrying, standing, walking, sitting, pushing or pulling, but

5

warned Plaintiff not to drive, climb or operate dangerous equipment for one year since the last seizure.  (Id. at 177-78).

Dr. Soo Park, a Social Security consultant specializing in internal medicine, examined Knox on February 8, 1999.  (Id. at 179-81).  Dr. Park related Plaintiff's recent medical history, including seizures, chest and shoulder pain, diabetes, high blood pressure and blood sugar, and arthritis.  (Id. at 179).  Dr. Park noted that Plaintiff was not taking medication for diabetes or for chest pain, though he was controlling his diet.  (Id.).  Plaintiff reported taking Prevacid for gastrointestinal bleeding, Tylenol with codeine for shoulder pain, Dilantin for seizures, and several blood pressure medications.  (Id.).  Plaintiff complained that he could not lift anything heavy or make a fist without experiencing pain.  (Id.).

Dr. Park's examination revealed that Plaintiff weighed 320 pounds with a blood pressure of 140/90.  (Id.).  Plaintiff did not appear to be in acute distress, and could walk, stand, undress and sit normally.  (Id. at 180).  Plaintiff had knee flexion limitations due to obesity, and could abduct the right shoulder 80 degrees with mild pain.  (Id.).  Plaintiff could make a full fist bilaterally and had normal finger movements.  (Id.).  Dr. Park's impressions were: history of seizures under control with medication, gastrointestinal bleeding and high blood pressure controlled with medication, atypical chest pain, right shoulder pain with decreased range of motion and diabetes.  (Id. at 181).  Dr. Park assessed moderate limitations on lifting, bending, walking, and in pushing and pulling with his arms.  (Id.).

Following a March 4, 1999 examination, Dr. Edmondson completed a second report for the Division of Disability Determination, repeating his earlier assessments but adding that Plaintiff had bilateral weakness in the APB (thumb) muscles, and weak and slow grip strength

and fine manipulation.  (Id. at 186-89).  Dr. Edmondson assessed a ten pound limit on lifting and

carrying, and that Plaintiff should not perform repetitive hand tasks.  (Id. at 190).

Dr. Danko Vidovich, a radiologist, took x-rays on March 9, 1999.  The x-rays were

negative for both the right shoulder and left knee.  (Id. at 192).

Dr. Roger Antoine, an orthopedic specialist, examined Knox on April 16, 1999.  (Id. at

201-2).  Plaintiff complained of pain, stiffness and decreased range of motion of the right

shoulder.  (Id. at 201).  Plaintiff stated he could only stand for five minutes, could only walk for

one-and-a-half blocks without stopping, and that he had difficulty climbing and descending

stairs.  (Id.).  He also complained of numbness in the entire right upper extremity, the right thigh,

and both legs, and of right wrist swelling and pain despite nightly use of wrist splints.  (Id.).

Knox also stated he could not feel the floor when he walked.  (Id.).  A physical examination

revealed that Plaintiff had a normal bilateral gait, but that he could not squat fully or walk on his

toes.  (Id.).  Plaintiff was not able to lie flat on his back because of dyspnea.  (Id.).  Plaintiff had

decreased range of motion of the shoulder with right shoulder pain and with crepitus in the

shoulder tendons.  (Id. at 202).  Plaintiff's right wrist was swollen and tender.  (Id.).  Right hand

grip strength was graded a 4/5.  (Id.).  Plaintiff also had reduced range of motion of the knees

with complaint of right knee pain, which was swollen.  (Id.).  Impressions included a status-post

sprain of the right shoulder, right wrist and right knee.  (Id.).  X-rays of the right knee performed

on April 19, 1999 showed calcific deposits in the quadriceps tendon.  (Id. at 203).

After an October 15, 1999 examination, Dr. Lin diagnosed Plaintiff with tenderness of the

right wrist and shoulder, seizure disorder, diabetes mellitus, and hypertensive heart disease, and

opined that these conditions would last at least a year.  (Id. at 205-6).  Dr. Lin listed at least eight

medications the Plaintiff was currently taking, and noted that Clonidine and Dilantin cause drowsiness, and that none of the prescribed medications would alleviate the Plaintiff's ongoing pain. (Id. at 207). Dr. Lin assessed that Knox would be able to sit and/or stand for no more than two hours total each in an eight hour workday. (Id.). The doctor opined that Plaintiff could lift or carry up to five pounds occasionally, but not more at any time. (Id. at 208). Further limitations included total restrictions on crawling and climbing, and an occasional allowance for bending, squatting, and reaching. (Id.). Dr. Lin noted that Plaintiff could not use his hands for any repetitive actions such as grasping, pushing, pulling, or fine manipulations. The doctor also found mild restrictions on unprotected heights, exposure to dangerous machinery, temperature, humidity, dust, fumes, and gases. Plaintiff was again warned not to drive. (Id. at 209).

After an examination on November 4, 1999, Dr. Edmondson noted symptoms including generalized seizure disorder, and pain, numbness and tingling in both hands and arms resulting from CTS. (Id. at 211). Dr. Edmondson also found weak APB (thumb) muscles and a positive Tinel's sign (indicating nerve irritation). (Id. at 212). The doctor assessed that the Plaintiff's conditions would last at least a year. (Id.). The report's list of treatments included Dilantin, wrist splints and Paxil (for CTS pain). (Id. at 213). Dr. Edmondson assessed that Plaintiff could only occasionally lift or carry up to five pounds, and that Knox could bend, squat or reach occasionally, but could not crawl or climb or use his hands for any repetitive hand tasks. (Id. at 214). He also assessed mild restrictions on unprotected height as well as exposure to dangerous machinery, temperature and humidity changes, dust, fumes, and gases. (Id. at 215).

On February 19, 2000, Dr. Edmondson again saw Knox, who reported that he still experienced right arm pain, but with improved ability to sleep. (Id. at 224). Dr. Edmondson

listed the Plaintiff as taking Dilantin and at least nine other drugs at this point, though Plaintiff had stopped taking Paxil for his CTS. (Id.).

Dr. Lin examined Knox on February 28, 2000. Plaintiff complained of pain in both shoulders and swelling in the right wrist. (Id. at 221). On March 8, 2000, Dr. Chase diagnosed bilateral CTS and noted weakness in the upper extremities. (Id. at 218).

## 2. Relevant Medical Evidence After April 28, 2000

By letter dated September 11, 2000, Dr. Edmondson described Knox's medical history and symptoms. (Id. at 262). The doctor again diagnosed the Plaintiff with CTS, diabetic neuropathy, and seizure disorder, with symptoms of pain, numbness, and tingling in both of his hands and arms, and that Knox's obesity resulted in degenerative joint pain in the hips and knees. (Id.). Dr. Edmondson opined that the claimant's CTS involved a pinched nerve in both wrists that had been developing gradually over several years, and that the symptoms would require lifetime treatment. (Id.). The doctor opined that Plaintiff's CTS was caused by his previous job activities, and that the hand disability had led to arm, shoulder and neck pains which prevented him from obtaining gainful employment and had triggered depression. (Id.).

Dr. Edmondson assessed that Knox's conditions prevented him from typing, writing, sorting, stamping, pushing, pulling, reaching up or forward, or lifting items greater than five pounds. The doctor noted that Plainitff's gait and station, balance, coordination, and motor power in the legs were "severely compromised" by diabetes and obesity. (Id.).

The letter recommended the continued use of wrist splints, yoga exercise, and daily dosages of Celexa and Dilantin. Dr. Edmondson concluded by stating that: "Mr. Knox is presently totally disabled for his job and for any other job requiring *any* use of his hands. His

prognosis for employability is poor."  (Id. (emphasis supplied)).

On September 28, 2000, Dr. Edmondson completed a physical capacity evaluation which advised Plaintiff not to engage in lifting, carrying, standing and walking, and assessed Plaintiff as able to sit only two hours per day.  (Id. at 263).

### 3.  Testimony of Medical Expert Dr. Ernest Abeles at July 10, 2003 Hearing

In the second hearing before ALJ Burlison, Dr. Ernest Abeles, an orthopedic surgeon, testified about Knox's conditions based on his review of the Plaintiff's medical records and his prior testimony.  (Id. at 411-12).  Medical expert ("ME") Abeles tesified that the record indicated that the Plaintiff suffered from obesity, adult-onset diabetes, and some type of seizure disorder, possibly related to diabetes.  (Id. at 412).  ME Abeles also believed that Plaintiff might have high blood pressure and cardiovascular disease based on prescribed medication and his obesity, though he found the record insufficient to support that diagnosis.  (Id. at 412-13).

ME Abeles questioned the Plaintiff's treating physicians' diagnosis of CTS because pain in the shoulders or forearms is not consistent with CTS, and also because there was a lack of medical evidence that could confirm a CTS diagnosis (such as a nerve conduction study or an EMG).  (Id. at 412, 415-16).  ME Abeles also noted a lack of evidence in the record that Plaintiff used the wrist splints provided for his impairment.  (Id. at 415).  ME Abeles disagreed with Plaintiff's assertion that Paxil had been prescribed for CTS pain, noting that Paxil and Zoloft were used to treat depression.  (Id.).

Furthermore, ME Abeles disputed the treating physician's assessment of shoulder pain and arthritis.  (Id. at 416-17).  ME Abeles saw "no objective reason" why Plaintiff could not reach overhead, since CTS should not affect the shoulder and no other evidence in the record

10

could clinically demonstrate shoulder pain. (Id.). ME Abeles also opined that there was "no documentation in the record" to substantiate a diagnosis of arthritis. (Id. at 417). However, given the Plaintiff's history, ME Abeles stated that he "wouldn't doubt" that Knox has arthritis in the knees and/or hips. (Id. at 414).

ME Abeles opined that the Plaintiff could lift ten pounds regularly and twenty pounds occasionally with restricted walking and light work using a stand/sit option. (Id. at 416, 418-19).

### D.  *Non-Medical Evidence*

#### 1.  *Plaintiff's Testimony at March 9, 2000 Hearing*

The first hearing before ALJ Burlison took place on March 9, 2000. (Id. at 357-388A). Plaintiff testified that he stopped working in 1998 after he had two seizures and woke up in the hospital. (Id. at 363). Knox stated that he had not had any seizures since 1998. (Id.).

Concerning his daily activity, the Plaintiff testified that he would get up at 6 a.m., wake up his daughter (Plaintiff is a single parent), lay her clothes out and bring her to school via "public transportation." (Id. at 362, 364). The Plaintiff would then come home and lay down for an hour. (Id.). After his nap, Knox would then make himself something to eat, take his medication, and sit outside or watch television. (Id.) Plaintiff ate mainly warm-up food, and shopped with the assistance of his mother and daughter. (Id. at 365).

Knox testified about his history of pain. Plaintiff related that Dr. Edmondson treated his pain in his arms and shoulders, and Dr. Lin treated him for chest and knee pain. (Id. at 366). He noted that his right knee stiffened up more than his left. (Id.). Plaintiff stated that he visited Dr. Chase for a possible pinched nerve in his neck, which Dr. Edmondson had diagnosed as CTS. (Id.). Dr. Lin assisted with Plaintiff's medications, because sometimes it gave Plaintiff "trouble

going to the bathroom."  (Id.).

Plaintiff stated that Dr. Lin was his primary physician, and that he saw a doctor an average of once every other week.  (Id. at 366-67).  He said he went to the cardiologist because he had trouble breathing, which improved over repeated visits and treatment with prescription medicine.  (Id. at 367-68).

Knox also testified that he had chest pain, and that he dropped things because he had grip weakness over the prior year and a half, especially in the right hand.  (Id. at 368).  Plaintiff stated that he had been wearing hand splints at night on both wrists because of possible nerve damage, but that Dr. Edmondson had not conducted any tests other than an x-ray.  (Id. at 368-69).  Cortisone shots he had received for wrist pain had only alleviated the sensation for one week.  (Id. at 369).

Plaintiff also claimed to be suffering from soreness and swelling of the legs.  (Id. at 369).  Plaintiff estimated his present weight to be between 330 and 360 pounds.  He stated that he saw a nutritionist, though he had gained back the weight lost during a six-week program.  (Id. at 370-71).  Knox stated that he took Glucophage for his diabetes, and that he took medication for high blood pressure and his heart condition.  (Id. at 371-72).

Plaintiff testified that he could not stand for more that half an hour, that he could only walk about half a block before having to stop and catch his breath, that he could not sit for extended periods, and that his knees were in pain while sitting at the hearing.  (Id. at 372).  Plaintiff estimated he could lift between five and seven pounds, based on his experiences of dropping items and being forced to use lighter, plastic dinnerware.  (Id. at 373).  Knox also testified that shoulder pain limited his ability to raise his arms over his head.  (Id. at 379).

Knox stated that he could not attend movies because it "gets uncomfortable." (Id. at 373). Plaintiff had not traveled since he stopped working and rarely visited friends or attended church, though he sometimes drove to his sister's house or chaperoned his daughter's class field trips. (Id. at 373-75).

Plaintiff testified that he had "trouble remembering things" since his hospital stay, and that a psychiatrist or psychologist had visited him at his home. (Id. at 376). Knox denied using alcohol, smoking, or using drugs. (Id. at 378-79).

Knox noted that his mother came to his home around three times a week to help straighten up, including washing clothes. (Id. at 376-77). Plaintiff stated that he needed his mother's assistance in moving articles around his home. (Id. at 377).

## 2. Plaintiff's Testimony at July 10, 2003 Hearing

At the second hearing before ALJ Burlison, Knox elaborated on his history of treatment and pain. Plaintiff testified that he stopped working in August 1998 after developing gastrointestinal bleeding and pain in the abdomen, knees, arms and shoulder. (Id. at 396). Plaintiff recalled a doctor's diagnosis of an enlarged heart and "congestional [sic] heart failure," that any further lifting or other work activity would endanger his life, and that he should stop working completely, a recommendation repeated one year later by Drs. Lin and Edmondson. (Id. at 397-98). Plaintiff reported difficulty lifting his arms over his head, and that sitting caused his knees to lock up. (Id. at 398). He stated that his obesity and heart condition caused shortness or breath, which prevented him from walking more than half a block. (Id. at 398-99). Walking was also difficult due to arthritis in the hips and knees. (Id. at 399).

Knox testified that the doctor had told him his CTS had caused pinched nerves in his

thumbs, and this resulted in difficulty in gripping and carrying objects.  (Id. at 400).  Though a doctor had prescribed Paxil to alleviate the pain in lieu of surgery, Plaintiff stated that the drugs "did me no good."  Plaintiff was told by his doctor that his CTS had been caused by using heavy, wet mops for eleven years as a custodian.  (Id. at 401).  Plaintiff could not lift or grip a drinking glass.  (Id. at 403).  Knox also noted that his mother had to come by often to help out with housework and shopping.  (Id. at 405).

Knox testified that Dr. Chase had given him Tylenol with codeine and cortisone shots for his arthritis, but that this treatment did not permanently alleviate his pain.  (Id. at 404).  Plaintiff's hands, wrists and forearms caused him considerable pain.  (Id. at 409).  Dr. Edmondson told Plaintiff that CTS caused his shoulder pain and limited range of motion, making him "very limited in what [he] could do."  (Id.). Plaintiff also referred to tingling and numbness in his fingers, which caused him to drop things.  (Id. at 411).  Knox stated that he was unable to write, and that his fingers cramped up frequently.  (Id. at 409). Despite his hand, wrist and forearm pain, Plaintiff testified that his doctors had decided to forego surgery, preferring instead to treat his CTS with medications such as Zoloft.  (Id. at 410).

       *3.     Testimony of Vocational Expert Raymond Cestar at July 10, 2003 Hearing*

Vocational Expert ("VE") Raymond Cestar testified after the Plaintiff at the second hearing before the ALJ.  (Id. at 421-26).  The ALJ described up a hypothetical vocational profile of a 41-year old, college-educated individual limited to a light level of work.  Specifically, the ALJ asked Cestar to identify jobs that allowed for: (a) carrying or lifting no more than ten pounds frequently and twenty pounds occasionally; (b) a stand/sit option; and (c) an individual who could not walk for extended, uninterrupted periods.  (Id. at 423).  Based on these limitations, VE

Cestar opined that Plaintiff's past relevant work was precluded. (Id.). However, VE Cestar stated that this worker could be employed either as a "parking lot attendant cashier" or as a "ticket seller." (Id. at 424).

Plaintiff's counsel then asked VE Cestar to add Dr. Lin's limitations of sitting and standing for no more than two hours each in an eight-hour workday, and lifting and carrying no more than five pounds occasionally. (Id. at 425-26). Based on these enhanced restrictions, VE Cestar found that the individual would not be able to work as a parking lot attendant or ticket seller, since the individual's "occupational based is eroded to less than sedentary." (Id. at 426).

## II.     DISCUSSION

### A.     *Standard of Review*

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error. 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). A reviewing court should verify that a claimant had a "full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act." Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 43 (2d Cir. 1972)).

A full hearing includes a well-developed medical record. Because of the non-adversarial nature of a benefits hearing, where the record is incomplete, an ALJ has an affirmative duty "to develop a claimant's medical history even when the claimant is represented by counsel . . . ." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). Further, in evaluating medical evidence, an ALJ must give good reasons for the weight

the ALJ assigns to the opinions of a claimant's treating source.  20 C.F.R. § 404.1527(d)(2); see

Rosa,168 F.3d at 79 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).

### B.    The ALJ's Decision

To receive benefits, a claimant must be "disabled" within the meaning of the Social

Security Act.  Shaw, 221 F.3d at 131.  Agency rules require the Commissioner to apply a five-

step sequential analysis to evaluate whether the claimant is disabled.  See 20 C.F.R.§404.1520.

1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.    If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.    If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw, 221 F.3d 126 at 132 (citing DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir.

2000)).

The ALJ acknowledged this five-step procedure in her decision.  (Tr. at 17-18).  The ALJ

found that the Plaintiff met the disability requirements of the first two steps, because he had not

engaged in substantial gainful activity since August 5, 1998, and because Knox's multiple medical conditions, including obesity, bilateral CTS, seizure disorder and hypertension were "severe" under 20 C.F.R. §§ 404.1521 and 416.921. (Id. at 18, 20). For step three, however, the ALJ found that the Plaintiff's impairments were not listed or equivalent to the conditions listed in Appendix 1. (Id. at 20).

With respect to the fourth step, ALJ Burlison found that the Plaintiff was unable to perform past relevant work, either as a school custodian or as a machine operator. (Id. at 24).

On the fifth and final step, ALJ Burlison found that Plaintiff was capable of performing certain sedentary occupations. (Id. at 25). The ALJ's assessment of Knox's residual functioning capacity ("RFC") permitted a "limited range of light work during the period at issue":

> I find that he was capable of standing or walking up to 6 hours in an 8-hour day, but that he could not walk for extended periods of time and would have needed to alternate between standing or walking and sitting at will; of sitting up to 6 hours in an 8-hour day; and of lifting, carrying, pushing or pulling up to 10 pounds frequently and up to 20 pounds occasionally. Nonexertionally, he was incapable of overhead reaching, and needed to avoid exposure to unprotected heights and dangerous moving machinery, but did not manifest other environmental or postural, manipulative, visual, hearing or mental limitations that would have affected his ability to perform light work.

(Id. at 23).

The ALJ rejected the findings from Dr. Edmondson's latter two reports from March and November 1999 because they presented revised and stricter RFC assessments than the January 1999 report without any significant new objective clinical evidence. (Id. at 22). Specifically, the ALJ rejected Dr. Edmondson's findings of new limitations in March 1999 of Plaintiff's grip strength, fine manipulations and restrictions of lifting and carrying over ten pounds, because the conclusions are:

not supported by clinical or electrodiagnostic test findings of any worsening of the [Plaintiff's] carpal tunnel syndrome, and . . . is totally inconsistent with with the [Plaintiff's] treatment and reduced need to use his hands since he stopped working.

(Id.).  The ALJ's opinion also rejected the RFC limitations assessed by Dr. Lin in his October 1999 report as unsupported by objective clinical evidence, and thus entitled to little weight.  (Id.). The ALJ based her opinion on the findings of ME Abeles:  "I found that the impartial assessment of Dr. Abeles . . . warranted the greatest weight."  (Id.). In rejecting the opinions of Drs. Edmondson and Lin, the ALJ credited ME Abeles's RFC findings, including the sit/stand option and an ability to lift ten pounds frequently and twenty pounds occasionally.  (Id. at 23).  The ALJ also credited VE Cestar's testimony that a person with Plaintiff's restrictions as stated by ME Abeles was capable of performing "light jobs" such as a ticket seller or parking lot attendant, finding the VE's analysis to be "competent, thorough and persuasive."  (Id. at 25).

The ALJ concluded that "[Plaintiff] was not under a 'disability,' as defined by the Social Security Act, at any time during the period from August 5, 1998 through April 28, 2000."  (Id. at 26).

### C.  Plaintiff's Claims

#### 1.  The "Treating Physician Rule"

The Plaintiff first claims that ALJ Burlison's December 2003 decision failed to give proper weight to the Plaintiff's treating physicians, pursuant to the Appeals Council's remand instructions to "explain the weight given to such opinion evidence of treating sources.  As appropriate, the Administrative Law Judge should request the treating sources to provide additional evidence and/or further clarification of the opinions and medical source statements

about what the claimant can still do despite the impairments." (Id. at 62; Pl.'s Mem. Supp. Mot. J. ("Pl.'s Mem."), at 9). The Plaintiff argues that the ALJ erred in crediting a non-examining medical expert over the opinion of Dr. Edmondson. (Id. at 8 (quoting Vargas v. Sullivan, 898 F.2d 293, 295-96 (2d Cir. 1990))).

The treating physician's rule as articulated by the Second Circuit provides: "the opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." Rosa, 168 F.3d at 78-79; 20 C.F.R. § 404.1527(d)(2). When the treating physician's opinion is not given controlling weight, the ALJ must apply the factors set out in 20 C.F.R. § 404.1527(d)(2)-(6), including:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

Based on these five factors, an ALJ must provide "good reasons" for assigning less than controlling weight to a treating physician's opinion. Torregrosa v. Barnhart, No. 03-CV-5275, 2004 WL 1905371, at *5 (E.D.N.Y. Aug. 27, 2004) (holding that inconsistency or a lack of objective medical evidence for a treating physician's opinion only makes that opinion *non-controlling*, but that the ALJ must still assign a weight to the opinion using the five-factor test). Further, before rejecting a physician's diagnosis, it is the ALJ's affirmative duty to seek additional information from the physician *sua sponte*. Chambliss v. Apfel, No. 98-CV-3382, 1999 WL 397502, at *4 (S.D.N.Y. June 15, 1999) (an ALJ's failure to develop treating

physician's records is cause for remand); 20 C.F.R. § 404.1512(e).

Principally, the ALJ failed to adequately address the length, frequency and nature of Plaintiff's treatment by Drs. Lin and Edmondson. See 20 C.F.R. § 404.1527(d)(2)(i). The ALJ disregarded the fact that Drs. Edmondson and Lin examined Knox on dozens of occasions during the relevant period, and that the physicians may have developed a unique understanding of Plaintiff's RFC through conversation and observation of Plaintiff's physical abilities. These doctors' detailed examinations and their sustained course of treatment may have provided them with both a "unique perspective" and a "longitudinal picture" for evaluating the Plaintiff's conditions. See id. For example, Dr. Edmondson's September 2000 diagnoses of "degenerative joint pains in [Plaintiff's] hips and knees," along with CTS that could have "slowly develop[ed] over many years" are significant findings based on a two-year course of treatment, and suggest that Plaintiff's RFC may have worsened during the relevant period. (Tr. at 262). See Havas v. Bowen, 804 F.2d 783, 786 (2d Cir. 1986) (finding of "degenerative" condition suggests that claimant "might well have been more impaired" at the time of the hearing than during the physician's examination).

The ALJ, however, chose to credit the opinion of ME Abeles, a non-examining consultant, rather than at least considering the detailed findings of Plaintiff's treating physicians. "[A] circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling to overcome a medical opinion." Wagner v. Sec'y of Health and Human Services, 906 F.2d 856, 862 (2d Cir. 1990) (holding that treating physician's opinion was entitled to great deference, even where the retrospective finding varied with earlier reports); see also Pagan v. Chater, 925 F. Supp. 547, 555 (S.D.N.Y. 1996) ("[T]he opinion of a non-

examining expert by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis."). ME Abeles's testimony did not present any "compelling evidence" that could directly contradict the independent and mutually supporting findings of Drs. Lin and Edmondson. The crux of ME Abeles's testimony was to point out that many of Plaintiff's diagnosed conditions lacked objective documentation, and that Dr. Edmondson's work restrictions lacked a medical basis.[1] (Tr. at 415, 419). However, ME Abeles's testimony did not add a contrary interpretation to the clinical observations of the treating physicians.[2] Though the ME hypothesized that more aggressive treatment such as surgery would have more strongly indicated a presence of CTS (id. at 415), the more conservative route of prescribing wrist splints and medication should not lead to a conclusion that the Plaintiff was not disabled. See Shaw,

---

[1] ME Abeles's assertions that the only treatment Knox had received for CTS was a "cock-up splint" (Tr. 415) is belied by the evidence in the record. Though Dr. Abeles opined that "Paxil and Zoloft are not medications for [CTS], but rather for emotional problems" (Id.), Paxil and Zoloft are anti-depressants which are also used to treat chronic pain. See, e.g., Dahlgren v. Barnhart, No. 04-C-50077, 2005 WL 66078, at *16 (N.D. Ill. Jan. 7, 2005) (Plaintiff prescribed Zoloft "for underlying symptoms of Fibromyalgia, not necessarily depression"; thus, evidence was legally insufficient to assess RFC limitations based on plaintiff's mental condition.).

[2] Though ME Abeles opined that Plaintiff might be able to perform light jobs with a stand/sit option, the ALJ erred in assuming that the jobs listed by VE Cestar employed such an option. This circuit has generally found that "sedentary" jobs (which require even less exertion than "light" work) do not necessarily permit the option. Rosario v. Sullivan, 875 F. Supp. 142, 148 (E.D.N.Y. 1995); see also Deutsch v. Harris, 511 F. Supp. 244, 249 (S.D.N.Y. 1981) ("The category of sedentary work may not include occupations which allow a worker to alternate sitting and standing as required for his comfort."). Since most sedentary jobs do not permit the stand/sit option, the ALJ should have inquired about whether Knox would be given such liberty as either a ticket seller or as a parking lot attendant. See Ramirez v. Heckler, No. 84-CV-0799, 1986 WL 8304, at *4 (E.D.N.Y. July 21, 1986) ("It is insufficient for the Secretary to assert that a claimant can perform a job without providing a description of the requirements of the job and demonstrating that the work does not require exertion beyond what the claimant is capable of performing.").

221 F.3d at 134-35 (holding that it is error for ALL to find "that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment imposed").

Similarly, the ALJ's consideration of the evidence in support of the treating physicians' opinions was insufficient. The ALJ's decision does not discuss the fact that Plaintiff's two primary treating physicians, Drs. Lin and Edmondson, provided mutually supportive findings regarding Plaintiff's RFC. Dr. Antoine also found abnormalities in Plaintiff's right-hand grip strength. (Tr. at 202). Dr. Park also assessed moderate limitations on arm movements. (Id. at 181). The ALJ erred in failing to consider the weight of the treating physicians' opinions in light of the diagnosis of CTS by Drs. Edmondson and Chase, as well as diagnoses of shoulder and wrist pain, spraining, swelling and tenderness by Drs. Lin, Antoine, and Park, which support a finding of RFC limitations on repetitive hand tasks, pushing, pulling, carrying, and lifting.

Further, the ALJ's finding that the opinions of Drs. Lin and Edmondson to be inconsistent with the record as a whole is not supported by substantial evidence. The ALJ found that Dr. Edmondson's RFC assessments of March and November 1999 deviated substantially from his January 1999 findings without providing clinical evidence to support the revised recommendations. (Id. at 22). Dr. Edmondson first diagnosed the Plaintiff with CTS in January 1999, and as CTS is a degenerative disease, the ALJ should have considered whether the Plaintiff's motor strength, grip and fine hand manipulations worsened over these months. Even though Dr. Edmondson revised his own findings and assessed greater restrictions, his new recommendations were supported by Dr. Lin's own independent evaluation. Thus, it is difficult to understand how the ALJ arrived at the conclusion that Dr. Edmondson's March and November 1999 reports are inconsistent with the record "as a whole." See 20 C.F.R. § 404.1527(d)(2).

Moreover, the ALJ erred in rejecting Dr. Edmondson's September 11, 2000 report as irrelevant because Dr. Edmondson's findings were "not in dispute as the [Plaintiff] has already been found to be 'disabled' since April 29, 2000." (Tr. at 20). The ALJ should have considered whether Dr. Edmondson's diagnosis of CTS and related symptoms could be applied retroactively, as the law of this circuit provides that "'a diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment.'" Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981) (quoting Stark v. Weinberger, 497 F.2d 1092, 1097 (7th Cir. 1974)).

In deciding to reject the evaluations of Drs. Lin and Edmondson, the ALJ also made no mention of the impact that their expertise and specialization played in the decision-making process. The ALJ, however, was required to consider this factor under the regulations. See 20 C.F.R. § 416.927(d)(2).

Finally, the ALJ erred in failing to procure objective medical evidence, in light of the Appeals Council's remand instruction that, if appropriate, "the [ALJ] should request the treating sources to provide additional evidence and/or further clarification of the opinions and medication source statements about what the claimant can still do despite the impairments." (Tr. 62). While the ALJ found a lack of medical evidence supporting Plaintiff's claimed conditions, the record is absent of any attempt by the ALJ to procure additional evidence from the treating physicians regarding Plaintiff's conditions. Furthermore, the ALJ did not attempt at the second hearing to obtain such information. To the extent that the ALJ rejected Drs. Edmondson's and Lin's diagnoses because of gaps in the record, the ALJ has an affirmative duty to develop the record *sua sponte*. Hartnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998).

The ALJ's rejection of the treating physicians' evaluations and opinions is not supported by substantial evidence, because from the record it is simply unclear whether this determination involved the application of all of the considerations required by the regulations. If an ALJ's decision includes a legal error, the district court may not choose to ignore the mistake and simply defer to the agency's factual findings. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). As a recent decision in our district noted:

> Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.

Torregrosa, 2004 WL 1905371, at *5. The appropriate remedy in such a situation is to remand the matter to the ALJ for further development and explanation of her findings. See Johnson v. Bowen, 817 F.2d 983, 987 (2d Cir. 1987). It is not the place of a district court to attempt to read between the lines of the administrative record to infer the ALJ's reasoning from subtleties; rather, the ALJ should illuminate the reasoning underlying her decision. See Schaal, 134 F.3d 496 at 500.

On remand, the ALJ should leave no doubt as to her findings. The ALJ should explain the appropriate weight to afford the treating physicians' opinions, and state the facts that lead to this conclusion. If the ALJ decides not to assign controlling weight to their findings, the ALJ should clearly state good reasons for this finding in accordance with 20 C.F.R. § 404.1527(d)(2). If any relevant facts are unknown, the ALJ should investigate these facts and present them in her decision in accordance with her obligation to develop the record. 20 C.F.R. § 1512(d), (e).

## 2. The Plaintiff's Credibility

The Plaintiff contends that the ALJ failed to properly evaluate his credibility because she failed to apply the proper standards in reaching her determination. (Pl.'s Mem., at 7). The ALJ found that Plaintiff's allegations regarding his impairments are "not totally credible as they are not entirely consistent with, or supported by, the overall thrust of the medical and non-medical evidence of record." (Tr. at 25). To the extent that the ALJ did consider the Plaintiff's credibility in reaching a determination that he was not disabled, it "is the function of the Commissioner, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte, 728 F.2d 588, 591 (2d Cir. 1984) (alteration in original) (quotation omitted). However, the ALJ must nonetheless make a determination of credibility under the standards set by the Social Security Administration and the law of this circuit. Section 416.929(c)(3) of title 20 of the C.F.R., as interpreted in Social Security Ruling 96-7p, 1996 WL 374186 (S.S.A. 1996), requires an ALJ to evaluate a plaintiff's report of her symptoms through a two-step analysis. First, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment[ ]--i.e., an impairment[ ] that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms." 1996 WL 374186 at *2; see also 20 C.F.R. § 416.929(b). Second, "once an underlying physical or mental impairment[ ] that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Id. Such an evaluation must include

consideration of the credibility of the plaintiff's subjective reports of pain, which in turn requires

that the ALJ "must consider" the following non-exclusive list of factors:

> 1. The individual's daily activities;

> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

> 3. Factors that precipitate and aggravate the symptoms;

> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id. at *2-3.  In reaching a determination regarding a plaintiff's credibility, an ALJ is also

obligated to consider relevant statements from treating and consulting physicians and any

observations noted by SSA employees during interviews.  Id. at *5.

Though the ALJ made passing reference to Social Security Ruling 96-7p in her decision

(Tr. at 21), it is clear that she did not consider all the relevant factors enumerated therein.  The

ALJ found that Plaintiff had a "combination of impairments considered 'severe.'"  (Id. at 25).

The ALJ, however, did not specifically address the medical evidence in the record in determining

whether the Plaintiff's CTS, diabetes, seizure disorder, or arthritis "could reasonably be expected to produce" the "pain or other symptoms" that Plaintiff testified to, which is the analysis demanded under the regulations. See 1996 WL 374186 at *2. Instead, the ALJ rejected the Plaintiff's complaints in their entirety, finding that "the infrequency of [Plaintiff's] doctor's visits, the conservative nature of the treatment prescribed, and his less than optimal compliance with prescribed treatment," as well as Knox's "reported activities of daily living, including maintaining a household for his 6 year old," were "not consistent with an individual who is suffering from debilitating symptoms." (Tr. at 23).

However, under the second factor listed in regulation 96-7p, the ALJ was obliged to consider whether the record indicated that Knox's impairments could cause the symptoms the Plaintiff contends he experienced. The ALJ did not consider Dr. Edmondson's finding that CTS had slowly debilitated the Plaintiff with "arm, shoulder, and neck pains," and that Plaintiff suffered from "degenerative joint pains in his hips and knees." (Id. at 262). Nor did the ALJ discuss Dr. Antoine's confirmation of complaints of wrist, shoulder and knee pain with an impression of a "status-post sprain of the right shoulder, right wrist and right knee." (Id. at 201-2). The ALJ also failed to consider that Dr. Lin confirmed Plaintiff's subjective complaints of pain in the right wrist and shoulder with a diagnosis of "tenderness of right wrist and right shoulder," including a finding of limited range of motion of the right shoulder. (Id. at 205-6). Finally, the ALJ did not weigh Dr. Edmondson's opinion that Plaintiff's complaints of "pain [and] tingling in both hands" were symptoms of diagnosed impairments such as CTS. (Id. at 185).

The ALJ also disregarded the fourth factor under 96-7p by failing to consider how side-

effects from Plaintiff's extensive assortment of medications may have reasonably produced pain and other disabling symptoms. The ALJ should have considered the Plaintiff's initial 1998 benefits claim that noted symptoms such as drowsiness, insomnia, and dizziness before rejecting Plaintiff's complaints of side-effects. (Id. at 101; see also Pl.'s Mem., at 6). Dr. Lin also assessed that Clonidine and Dilantin could cause drowsiness and limit Plaintiff's activities. (Id. at 207). If a plaintiff's subjective complaints are consistent with the treating physician's opinion, the ALJ must look beyond the objective medical record and carefully weigh the alleged pain and symptoms. Ilarda v. Chater, No. 95-CV-2180, 1996 WL 389366, at *13 (E.D.N.Y. July 8, 1996); see also 1996 WL 374186 at *4-5.

Furthermore, the ALJ erred in rejecting Plaintiff's allegations of debilitating pain because the symptoms were "not demonstrated in the record." (Tr. at 23). "[S]ubjective *pain* may serve as the basis for establishing disability, even if . . . unaccompanied by positive clinical findings or other 'objective' medical evidence." Donato v. Sec'y of Health and Human Services, 721 F.2d 414, 419 (2d Cir. 1983) (italics in original); see also SSR 96-7p(4), 1996 WL 374186 at *1 ("An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."). Thus, even Plaintiff's complaints of symptoms that were not verified by his treating physicians, such as shortness of breath, (Tr. at 107, 113), must be included in the ALJ's credibility analysis. If the ALJ found that Knox's allegations could not be verified by the medical evidence because of gaps in the record, as stated infra, she had the affirmative duty to fill in the evidentiary gaps *sua sponte*. Perez, 77 F.3d at 47; see also Rosa, 168 F.3d at 79.

The ALJ also ignored and misapprehended Plaintiff's testimony regarding his daily activities, which the ALJ was required to consider as the first factor in the analysis. With respect to Plaintiff's day-to-day living, the ALJ noted that Knox maintained a household for his six year-old daughter, and that he walked her to and from school every day. (Tr. at 23). However, Knox stated in the March 2000 hearing that he did not walk his daughter to school; rather, Plaintiff testified that *they took the bus*. (Tr. at 362). Furthermore, the ALJ did not discuss Knox's testimony that he is unable to walk more than half a block without stopping to catch his breath, or about his largely house-bound lifestyle, including that he rarely visited friends or went to the movies because of physical discomfort and that his mother assisted him several times a week with his housework and cooking. (Tr. 106, 372-74, 405). The fact that Plaintiff was able to take his daughter to school should not necessarily imply his ability to perform work without disabling symptoms, such as pain. See Balsamo v. Chater, 142 F.3d 75, 81-82 (2d Cir. 1998) ("'[W]hen a disabled person gamely chooses to endure pain in order to pursue important goals,' . . . 'it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working.'") (quoting Nelson v. Bowen, 882 F.2d 45, 49 (2d Cir. 1989)).

The ALJ also failed to consider Plaintiff's unblemished and consistent work history at the school district, where Knox was continuously employed for at least ten years prior to August 1998. (Tr. at 360). A claimant's work history should be a factor that "entitles [a plaintiff] to greater believability." Ilarda, 1996 WL 389366, at *15; see also Singletary v. Secretary, 623 F.2d 217, 219 (2d Cir. 1980).

Lastly, the ALJ's eligibility findings based on Knox's life activities did not consider

29

whether Knox could work on a "regular and continuing basis." Social Security Ruling 96-8p,
1996 WL 374184 (S.S.A. 1996). This rule requires that an ALJ assess a plaintiff's ability to
work for eight hours a day, five days a week. Id. "Several district courts and Courts of Appeals
have reversed decisions of the Commissioner for not evaluating RFC on this basis." Brown v.
Barnhart, No. 01-CV-2962, 2002 WL 603044, at *6 (E.D.N.Y. Apr. 15, 2002). The ALJ found
Knox capable of performing this light work based largely on his exertional capabilities and daily
life. (Tr. at 23). However, a proper RFC assessment also assesses a claimant's ability to
complete work tasks on a daily basis, a finding that can not be made solely by recounting
occasional exertional activities. "The Second Circuit has frequently rejected determinations that
a person is not disabled based on minimal activities of daily life not engaged in for 'sustained
periods comparable to those required for a sedentary job.'" Sarchese v. Barnhart, 2002 WL
1732802, at *8 (E.D.N.Y. July 19, 2002) (quoting Carroll v. Sec'y of Health and Human
Services, 705 F.2d 638, 643 (2d Cir. 1983)).

On remand the ALJ should apply Social Security Rulings 96-7p and 96-8p meaningfully.
First, the ALJ should address whether the Plaintiff's medical impairment reasonably might be
expected to give rise to the type of pain of which she complains. Second, the ALL should make
a full examination of the Plaintiff's explanations regarding his ability to carry out daily activities
and the efficacy of medication and treatment, and should also address other relevant factors
provided in the regulations concerning the Plaintiff's credibility in determining whether Plaintiff
can work on a regular and continuing basis.

### D.       *Remand or Award of Benefits*

The Plaintiff moves that the Defendant's decision be reversed, and in the alternative remanded for a new hearing and decision.  (See Pl.'s Mem., at 2).  "When the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," reversal of the ALJ decision and remand solely for the calculation of benefits is appropriate.  Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).  However, "when there are gaps in the administrative record or the ALJ has applied an improper legal standard," a court should remand the case to the Commissioner for the further development of the record.  Id.; see also Sobolewski, 985 F. Supp. at 315 ("Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is in order.").

As there are numerous areas that the ALJ failed to consider in reaching her decision, remand is the more appropriate remedy in this case.  Moreover, the medical record contains conflicting evidence, and "it is for the SSA, and not [a] court, to weigh the conflicting evidence in the record."  Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998).  I thus deny Plaintiff's request for reversal and an award of benefits, and grant Plaintiff a remand for a new hearing and decision.

**II.     Conclusion**

For the foregoing reasons, the Commissioner's motion is DENIED and the Plaintiff's motion is GRANTED to the extent that this case is REMANDED to the Social Security Administration for further proceedings consistent with this opinion.

SO ORDERED.

Dated:  July 31, 2006                                          /s/ Nicholas Garaufis_____
      Brooklyn, NY                                         NICHOLAS G. GARAUFIS
                                                                  United States District Judge